## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MEDSIS INTERNATIONAL, INC.; JOSHUA DAX CABRERA; and PAUL HESS,<br><br>Defendants. | Case No.<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against Defendants Medsis International, Inc. ("Medsis"); Joshua Dax Cabrera ("Cabrera"); and Paul Hess ("Hess"); and hereby demands a jury trial and seeks monetary and injunctive relief:

### SUMMARY OF THE ACTION

1.      Beginning in 2015 and continuing through at least 2020, Joshua Dax Cabrera of Florida and Paul Hess of Massachusetts partnered to deceive investors.  They fraudulently raised millions of dollars from U.S. and foreign investors during an unregistered offering of securities of Medsis, a start-up technology company founded by Cabrera that describes itself as a financial and data software technology company.  While offering and selling Medsis securities, Cabrera and Hess each made multiple material misrepresentations and misleading statements to prospective investors concerning the existence and value of contracts with customers, past and future revenue from such contracts, and business operations.  They told prospective investors

Medsis had entered into large lucrative contracts with Central and South American customers, when it had not.  They told prospective investors that Medsis had earned and "booked" revenue, when it had not.

2.      Hess and Cabrera made misrepresentations and fraudulent omissions in the following areas:

a.  Hess misled investors by misrepresenting the support of a critical business partner to execute a pilot program with Panama's Ministry of Health and the resulting revenue Medsis would earn from the program;

b.  Cabrera and Hess lied to investors by telling them Medsis had signed a lucrative contract with the government in Lima, Peru, when, in fact, it had not.

c.  Hess misled investors about the size and value of a deal with a Brazilian insurance entity;

d.  Cabrera and Hess lied to investors by stating that Medsis would earn revenue in February 2017 and had earned revenue during 2017;

e.  Cabrera and Hess lied to investors when they represented that Medsis booked $1.1 billion of revenue in early 2018;

f.  Cabrera and Hess misled investors about the value of an agreement with an Argentinian trade union and failed to tell investors that it was contingent upon the action of the Argentinian government; and

g.  Cabrera lied to investors when he said to them that Medsis was in July 2018 generating revenue under a contract with a Brazilian entity;

3.      In addition, Cabrera hid from investors his personal use of investor funds, and Hess lied to investors about his receipt of commissions and compensation for raising investor

funds.

4.      Cabrera and Hess' scheme involved the offer and sale of securities issued by Medsis.  From at least March 2015 through the present, Medsis, Cabrera, and Hess collectively obtained approximately $12.9 million in proceeds from their sales of securities to more than 160 investors.

5.      None of the offerings or securities were registered with the Securities and Exchange Commission or any foreign regulatory agency.  No exemption to register applied.

6.      By engaging in the conduct alleged in this Complaint:

a.      Medsis, Cabrera, and Hess  engaged in a fraudulent scheme (or, in the alternative, Cabrera and Hess aided and abetted the Medsis scheme) through a series of fraudulent acts, statements, and material omissions; employed devices, schemes, and artifices to defraud investors; and, engaged in acts, transactions, practices, and courses of businesses which operated as a fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)];

b.      Medsis, Cabrera, and Hess engaged in (or, in the alternative as to Cabrera and Hess, aided and abetted) the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)];

c.      Hess induced and attempted to induce the purchase and sale of securities without being registered as a broker or dealer or being associated with a registered broker or dealer, in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

7.      Based on these violations, the Commission seeks:

a.      entry of appropriate permanent injunctions, including an injunction prohibiting

Defendants from further violations of the relevant provisions of the federal securities laws and injunctions prohibiting Hess and Cabrera from directly or indirectly, participating in the offer or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own respective personal accounts;

      b.  disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; and

      c.  imposition of civil penalties.

## <u>JURISDICTION AND VENUE</u>

8.     The Commission seeks permanent injunctions and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

10.    Venue is proper in this District because the acts, transactions, or courses of business constituting the alleged violations occurred, in whole or in part, in the District of Massachusetts, and because Defendants have transacted business in Massachusetts.  Hess is a resident of Massachusetts and works in Massachusetts.  In addition, Cabrera and Medsis both obtained services from and schemed with Hess and his sole proprietorships located in Massachusetts to offer and sell securities to investors, including investors in Massachusetts.

11.    In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or

communication in interstate commerce.

12.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

13.     Unless enjoined, Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

14.     **Paul Hess**, age 65, resides in Braintree, Massachusetts.  He owned Braintree Mobiletech, LLC ("Mobiletech") and currently owns Braintree Hill Ventures, LLC.  Until 2010, Hess was an investment adviser representative and was associated with a registered broker-dealer.

15.     **Joshua Dax Cabrera**, age 41, resides in Miami, Florida and is the founder and CEO of Medsis.

16.     **Medsis International, Inc.** is a company, organized under the laws of Delaware, with a principal place of business in Florida.  Medsis International is the parent company and successor to Medsis Medical Systems, S.A., which is a company, organized under the laws of Panama, with a principal place of business in Panama.  Medsis describes itself as a financial and data software technology company.

## FACTS

**I.     The Medsis Fraudulent Scheme.**

17.     Throughout Medsis' offering of securities, Hess and Cabrera worked together to portray Medsis as something it was not:  a revenue-generating fast-growing technology start-up company.  In the course of their scheme, Hess and Cabrera made materially false and misleading

statements and fraudulent omissions about Medsis' supposed business relationships; the existence of executed agreements with customers; past and future revenue from such agreements; Cabrera's misappropriation of corporate funds; and Hess' personal benefit from raising investor funds.

18.    Founded in 2013, Medsis originally focused on providing governments and large institutions with services relating to medical record databases.

19.    By 2015, Medsis had expanded the scope of its business to include other types of databases that could be paired with a payment card or mobile payment system.  Payment cards were pre-paid or loadable credit cards (with loadable cards, money can be loaded onto the card after it is issued to the end-user), which end-users could use to pay for goods and services.

20.    From 2015 to 2020, Defendants collectively raised at least $12.9 million from investors through the unregistered public offering of Medsis securities.  The following chart summarizes the offering of Medsis securities:

|   | **Description** | **Time Period** | **Amount Raised** |
|---|---|---|---|
| 1. | Offer and sales of Medsis stock through intermediaries; | 4/2015 – 6/2016 | $1,667,500 |
| 2. | Offer and sales of Medsis stock through Hess' holding company Mobiletech; | 8/2016 – 6/2017 | $1,392,500 |
| 3. | Offer and sales of Medsis stock; sold through Australian broker;* | 6/2017 – 9/2018 | $1,703,000 |
| 4. | Offer and sales of notes convertible into Medsis stock; U.S. and Singapore investors;* | 10/2017 – 1/2018 | $793,000 |
| 5. | Offer and sales of Medsis stock; | 3/2018 – 5/2018 | $1,128,000 |
| 6. | Offer and sales of Medsis stock with an annual dividend payment from Medsis equal to 100% of invested principal; ($4.4 million involved Hess) | 7/2018 – 12/2019 | $5,206,000 |
| 7. | Promissory notes convertible into Medsis stock; | 5/2019 – 9/2019 | $491,000 |
| 8. | Promissory notes convertible into Medsis stock. | 1/2020 – 3/2020 | $525,000 |

* Hess was not directly involved in these sales.

**A. Cabrera's and Hess' Roles in Medsis' Fraudulent Offering of Securities.**

    **i.   Cabrera**

21.     Cabrera co-founded Medsis.  As its Chief Executive Officer, he managed the entire enterprise.  Cabrera directed and actively took part in business development, sales, marketing, and fundraising for Medsis.

22.     Cabrera was involved with and knowledgeable about all business deals Medsis pursued.

23.     Cabrera told prospective investors that he often travelled to different countries to meet with potential customers to develop business opportunities and negotiate contracts.

24.     Cabrera took an active part in selling Medsis securities and communicating with investors.

25.     Cabrera signed most agreements with investors on behalf of Medsis.

26.     Cabrera drafted quarterly updates and promotional pieces describing Medsis' purported successes and developments, which he or Hess sent to prospective investors.

27.     Cabrera participated in the drafting of other promotional pieces and presentations intended for investors or prospective investors and communicated directly with investors either orally or via email, text, or messaging applications.

28.     Cabrera regularly joined Hess to record conference calls to send to investors to provide updates on Medsis and to solicit prospective investors to invest in Medsis.  Cabrera also recorded his own video statements which he sent to prospective investors.

29.     As described below, Cabrera made numerous fraudulent misrepresentations to prospective investors in furtherance of the scheme.

    **ii.   Hess**

30.     By January 2015, Hess was trying to create business partnerships between Medsis

and certain U.S. companies.

31.     Hess introduced Medsis to Mozido, Inc., a Texas-based financial technology company, which was then working to develop a mobile payment and banking system.  At the time, Hess worked for Mozido as its Vice-President of Global Business Development.

32.     After Mozido declined to work with Medsis, Hess and Cabrera decided that Hess would raise the money Medsis needed for its operations from investors.

33.     Hess used his knowledge about Medsis' business and financial condition obtained from advising Cabrera and Medsis to offer and sell securities on Medsis' and Cabrera's behalf.

34.     Hess acted as one of Medsis' primary points of contact with and main conduits of information for prospective investors.  He regularly emailed and spoke with investors.

35.     Hess drafted Medsis investor presentations for the company that detailed Medsis' business plans and opportunities.

36.     Every few months, and often more frequently, Hess hosted conference calls with investors to promote Medsis.  Medsis principals, like Cabrera, often participated in these calls, promoting and touting investment in Medsis.

37.     Hess also recorded conversations he had with Cabrera and others at Medsis.  He provided these recordings to investors and prospective investors to promote Medsis, solicit investments, and provide information about the company.

38.     Hess described himself in emails and promotional materials to prospective investors as an advisor to Medsis with an insider's knowledge and access to information.

39.     For instance, in an email to prospective investors in October 2016, Hess wrote, "I am in a position of direct control of the money aspects of this company and am the top financial advisor to the founder Dax Cabrera…."

40.     During his communications to investors, Hess portrayed himself as part of Medsis and typically used the pronoun "we" when he referred to Medsis or the Medsis executive team.

41.     During a presentation recorded on or about February 11, 2017 for prospective investors, Hess said that with Medsis he was "very much hands on."  He said, "I'm dealing with the money.  I'm dealing with the decision making and everything that's going on to build this company.  I can see it firsthand."

42.     Medsis also portrayed Hess as part of its executive team.  For instance, in Medsis presentations that Hess sent to solicit investors in January and February 2017, Medsis labeled Hess a "Key Executive."

43.     In a Medsis business update sent to prospective investors by Hess in January 2017, Medsis represented that "in his role at Medsis, [Hess] is calling upon a career of diverse experience working with companies across a broad spectrum of industries to help guide Medsis toward achieving key financial objectives and maximum growth."

44.     As described below, Hess made numerous fraudulent misrepresentations to prospective investors in furtherance of the scheme.

**B.  Hess Misrepresented Mozido's Support of Medsis and that a Pilot Program Contract with Panama's Ministry of Health Would Generate Significant Revenue for Medsis.**

45.     In **the first quarter of 2015,** Medsis was working on entering a contract with Panama's Ministry of Health.  The contract was to operate a pilot program at a one clinic in Panama.

46.     In the pilot program, Medsis was to demonstrate its ability to integrate databases and create a national mobile application and digital billing system to work with the integrated database.

47.     To complete the contract, Medsis needed a partner with technological expertise. Hess wanted his then-employer, Mozido, to partner with Medsis and provide the technological expertise Medsis lacked.  Hess told Mozido that Medsis needed help with the technical platform for a national mobile application and digital billing system for the Panama pilot project.

48.     Mozido's Latin America division declined to work with Medsis on the Panama pilot program, which Hess knew on or about February 11, 2015.

49.     On or about March 24, 2015, Medsis contracted with Panama's Ministry of Health to operate the pilot program at one clinic in Panama.

50.     The entire cost of the pilot program was to be borne by Medsis.  Medsis had less than 31 days to begin the pilot project and to solve any problems that arose with its implementation

51.     This contract prompted Medsis to raise funds from investors.

52.     Hess misled investors about Mozido's support of and partnership with Medsis and omitted that Mozido had declined to work with Medsis.  He fraudulently omitted Medsis' inability to complete the Panama contract without a technical partner, which Medsis had not secured.  And, Hess materially misstated the revenue that Medsis would generate from the pilot program.

   **i.     In Investor Solicitations, Hess Misrepresented Mozido's Involvement with the Panama Contract.**

53.     In email solicitations Hess sent to investors in March and early April 2015, Hess represented that Medsis needed to raise money to fund the program in Panama.  Hess copied Cabrera on his email solicitations.  Hess wrote that "[w]e are going to…do this through our private investment group and then we expect to bring in Mozido as our total payment platform."

54.     Hess' solicitations pitched investors on Mozido's future role with Medsis.  He

represented that:

> Mozido obviously has a world class mobile-commerce application, already
> equipped with all of the required security features needed for this….More
> importantly, Mozido has the ability to monetize both the smartcards as well as the
> entire array of mobile financial services.  We believe Mozido would clearly be the
> preferred partner to have for this portion of our company and through several of
> our partners in Medsis, our established deep relationship with Mozido can help
> make this happen….In this proposed partnership, Medsis would share in any
> revenues generated by the Mozido transaction model.
>
> ….
>
> This system has the potential to include the medical records of a vast majority of
> the people on the planet, all tied into one system of smartcards and mobile
> wallets.  We next plan to bring the system to Jamaica (and then the Bahamas),
> which can quickly double the size of Medsis.  With Mozido's already strong
> connections in Jamaica, implementation there should be something we can do
> with existing partners, who also have strong ties in the Bahamas.

55.     Hess had previously convinced many of the prospective Medsis investors to
invest in companies affiliated with Mozido.  For these investors, Mozido's involvement was an
attractive prospect.  Hess knew that and leveraged their faith in Mozido to persuade them to
invest in Medsis.

56.     Hess' statements to prospective investors about Mozido's future involvement
were misleading because he omitted that Mozido's Latin America division had previously
declined to work with Medsis, in or about early February 2015.

57.     Hess' statements to prospective investors were also misleading because Hess
omitted that Medsis did not have the capabilities to successfully and unilaterally complete the
pilot program at that time, and that, without the technological knowledge and partnership of
Mozido or other companies, Medsis could not execute the full scope of the pilot program.

58.     Hess knew that Medsis was unable to complete the pilot program on its own.  Yet
he intentionally omitted Medsis' inability to complete the pilot program from his solicitations.

11

59.     Hess' intentional omissions were material to prospective investors.

**ii.     In Investor Solicitations, Hess Falsely Claimed the Panamanian Pilot Program Would Generate Significant Revenue for Medsis, When It Would Actually Generate Little to No Revenue.**

60.     In the email solicitations Hess sent to investors in March and early April 2015 (described above), Hess also misled prospective investors about the amount of revenue Medsis would make from the Panama program.

61.     Hess stated that the "Panama initial order" would generate $29 million of revenue for Medsis.

62.     This was misleading because the pilot program—the only work Panama's Ministry of Health had contracted for Medsis to provide—would not generate $29 million in revenue for Medsis.

63.     The pilot program was to test Medsis' capabilities. The government was not paying Medsis for its work, and the program would result in minimal to no revenue for Medsis.

64.     Hess and Cabrera knew or were reckless and/or negligent in not knowing that the statements were false.

65.     Medsis ultimately failed to parlay the pilot program into a revenue-generating contract with Panama's Ministry of Health.

**C.  Cabrera Falsely Represented that Medsis Had Entered into Revenue-Generating Deals with Customers.**

66.     In December 2015, Cabrera falsely represented to prospective investors that Medsis had entered into revenue-generating contracts with customers when, in fact, it had not.

67.     In December 2015, Cabrera joined Hess in a recorded telephone interview to be sent to prospective investors.  During the interview, Cabrera said that Medsis had already entered into deals with customers, that were, in his words, "green lit" and would generate between $80-

90 million in gross revenue in 2016-2017.  Cabrera distinguished these deals from other projects not yet "green lit."

68.     Cabrera's statements were false or misleading because at the time, Medsis did not have projects that would generate revenue under contract or that had received approval.  Cabrera knew this from his work pursuing these business opportunities and negotiating any applicable agreements.

### D.  Defendants Falsely Represented that Medsis Had Entered Into a Lucrative Contract in Peru.

69.     Hess and Cabrera made multiple false representations about a contract to provide database and digital payment services to a city-wide health care system in Lima, Peru.  At various times these included representations: (i) that the contract was signed, (ii) that the contract entitled Medsis to "guaranteed" revenue; and (iii) that the contract caused Medsis' valuation to exceed $100 million.

### i.   There Was No Signed Contract.

70.      Hess and Cabrera lied to prospective investors in 2016 and 2017 when they repeatedly represented that Medsis had executed a profitable contract with the city-wide health system in Lima, Peru.

71.     In fact, Medsis had not executed a contract with the health system at the time Hess and Cabrera made their representations.  Medsis and the health system in Lima, Peru did not execute a fully signed contract until April 2017.  The contract that was actually executed in 2017 was materially different in nature (Medsis gifted the client its services – there was no provision for "guaranteed" payments from client) and scope (not 11 million users) than the purported contract Cabrera and Hess described to investors in 2016 and early 2017.

72.     Hess first falsely represented the existence of the Peru contract in an email to

13

investors on July 26, 2016. He stated that he had "held off giving everyone an update because I wanted us to first get the official contract from Peru before talking all the numbers and resulting value. Well we now know this deal is a certainty and the numbers are amazing."

73. Hess and Cabrera continued throughout the summer and fall of 2016 to falsely represent to prospective investors that the contract with the health system in Lima, Peru was signed. They made these false representations in presentation slide decks that outlined the terms of the offer for interests in Medsis sold through Hess's firm, Mobiletech.

74. On August 4, 2016, Hess circulated to prospective investors a presentation slide deck from Medsis ("August 2016 Pitchbook"). The August 2016 Pitchbook presented Medsis' "recent big wins in Peru & Jamaica," and its resulting valuation. Through the August 2016 Pitchbook, Defendants made several misrepresentations and fraudulent omissions. For instance:

    a. The August 2016 Pitchbook represented to investors that Medsis had "closed" on a contract with the healthcare system of Lima, Peru.

    b. The August 2016 Pitchbook stated that the contract with the health care system in Lima, Peru would involve data from or interaction with 11 million users.

    c. Multiple times the August 2016 Pitchbook represented that the Peru deal was "executed," "closed," "signed," or "under agreement."

    d. The August 2016 Pitchbook described the Peru contract as "historic," and "first-of-its-kind."

    e. The August 2016 Pitchbook distinguished the Peru contract from potential deals that were described as just "under negotiation."

75. In August 2016, Hess emailed to potential investors multiple versions of the August 2016 Pitchbook. They all contained the same misstatements detailed above.

76.     Hess and Cabrera also made misrepresentations and fraudulent omissions in audio presentations to investors.

77.     For instance, on August 21, 2016, Hess sent an email to investors again soliciting their investment.  In his email, Hess included a link to an audio recording of a conversation he had with Cabrera on August 20, 2016.  The August 20, 2016 recorded discussion between Hess and Cabrera was intended as a presentation for investors.  Hess and Cabrera made multiple misrepresentations and omissions in this recording, including:

   a.   Towards the beginning of the recorded discussion from August 20, 2016, Hess stated "we know that we have the Peru deal."

   b.   During the part of the conversation when Hess and Cabrera discussed the status of the agreement, Cabrera described the agreement's path through the bureaucratic process in Peru.  Hess then asked:

   > Hess: "is there any chance this could end up not happening then?"
   > Cabrera: "no, at this point, no."
   > Hess: "ok, that was my understanding too, but I wanted to hear it from you again."
   > Cabrera: "No, at this point it is a done deal."

   c.   Towards the end of the recorded discussion from August 20, 2016, Hess stated, "the main points for investors are these: we have customers already, we have deals in place, we have deals lined up…"

78.     On September 1, 2016, Hess hosted another conference call with Cabrera and prospective investors.  During the call, Hess and Cabrera contradicted their August statements, and represented that no agreement had been finalized in Peru.  Hess said on the September 1, 2016 call that the Peru deal still needed to be fully approved, and that he believed it would take another 2-3 weeks to get the official sign-off in Peru.  Yet, Hess and Cabrera still made

misleading statements during the September 1 call.  For instance:

    a.  Hess also said about the Peru contract that when he uses the expression "done deal" it means that "we're ourselves virtually 100% sure that these deals are in place."

    b.  During the call, Hess and Cabrera discussed Medsis' valuation.  Hess falsely represented that Medsis has "customers already" and that "we already have essentially 11 million [individuals in Peru] that are committed to this system."

79.    Hess also made misrepresentations and fraudulent omissions about the Peru contract in emails to prospective investors.  For instance:

    a.  In an August 4, 2021 cover email for the August 2016 Pitchbook, Hess falsely stated that Medsis had a signed agreement in Peru, "[w]ith our recent deals signed in Peru and Jamaica, Medsis has had a major jump in value."

    b.  In an August 23, 2016 email solicitation sent to investors, Hess falsely claimed that the Lima, Peru contract was "guaranteed."  Hess wrote that the Peru contract would deliver 30 million users in the fall of 2016, and that those 30 million users would cause Medsis to reach a $300 million valuation in early 2017.

    c.  In an October 11, 2016 email to prospective investors, Hess falsely represented that the Peru project was "already kicked off for 11 million users."

80.    Hess and Cabrera's statements were misleading because Medsis had not entered into a contract with the healthcare system in Lima, Peru.  The contract was not signed.  Nor was it guaranteed.  Medsis did not have "deals in place," "deals signed in Peru," or 11 million users committed to using Medsis' system.

81.    In January 2017, Hess and Cabrera continued to falsely represent that Medsis had

signed a contract with the health care system in Lima, Peru.  In a January 14, 2017 email offering securities to prospective investors, Hess wrote that Medsis had "commitments for a total of some 20 million users" including the Peru deal.

82.     Hess attached an updated version of Medsis' August 2016 Pitchbook, dated January 2017, to the email he sent on January 14, 2017 ("January 2017 Pitchbook").  The January 2017 Pitchbook again misrepresented that the Lima, Peru agreement was "closed" and "executed" and that 11 million users in Peru were committed to Medsis.

83.     Hess' email and Medsis' January 2017 Pitchbook was misleading because at that time there was no executed contract with the healthcare system in Lima, Peru and there were not 11 million users committed to Medsis.

84.     These fraudulent misrepresentations were material to investors who were very interested in Medsis securing contracts with customers and Medsis generating revenue.

85.     Throughout 2016 and early 2017, Hess and Cabrera both knew that the contract in Peru was not signed.  As CEO of Medsis, Cabrera knew from his negotiations of the contract that the health care system in Lima, Peru had not signed a contract with Medsis.  Hess also knew that no contract was signed from his receipt of documents from Peru and discussions with Cabrera and others at Medsis.

**ii.     There was no "Guaranteed" Revenue.**

86.     Hess and Cabrera also lied to prospective investors by telling them that Medsis was entitled to millions of dollars in "guaranteed" revenue under the purported agreement with the health system in Lima, Peru.

87.     The August 2016 Pitchbook represented that Medsis would receive a "guaranteed payment stream" of $19 million over the life of the ten-year contract and more than $3.3 million

within the first 39 months.

88.     The August 2016 Pitchbook also stated that Medsis would be profitable once it started receiving cash from the Peru agreement.  The August 2016 Pitchbook represented that Medsis would be profitable in 2016, and "highly profitable" in 2017.

89.     On the recorded call from August 20, 2016 that was sent to prospective investors, Cabrera and Hess made multiple misrepresentations and fraudulent omissions about revenue from the Peru contract.  As detailed above, the contract was unsigned, and thus, at the time, could not generate any revenue for Medsis.  Cabrera and Hess' false statements included:

      a.     Cabrera said there was a 10-year payment schedule for the government health
          care system in Lima, Peru to pay Medsis for services under the (supposed)
          contract.

      b.     Hess said that the guaranteed payments from the Lima government to Medsis
          from the deal amounted to about $2 million a year.

      c.     Hess and Cabrera also compared Medsis to the company WhatsApp.  Cabrera
          described how the deals Medsis was working on would deliver more users than
          WhatsApp, which Cabrera said was acquired by another company for $19 billion
          on the basis of the number of its users.  Hess then exclaimed, "And we have
          revenue and they don't."  Cabrera agreed, stating, "We have revenue."

90.     The January 2017 Pitchbook (sent to investors in January 2017) falsely stated that Medsis would be profitable once Medsis received the first payments from Peru.

91.     These statements above were false.  There was no contract signed with the health care system in Lima, Peru, no revenue, no "guaranteed payment stream" of nearly $2 million in the first year and $19 million over a ten-year payment plan, and no ability to become profitable

from the non-existent contract.

      **iii.   The Purported Basis for Defendants' $110 Million Valuation of Medsis Was False.**

92.      Hess and Cabrera misled prospective investors by falsely stating that Medsis had a $110 million valuation based upon its contract with the healthcare system in Lima, Peru.  In reality, the contract was not even signed.

93.      The August 2016 Pitchbook stated that the Peru deal provided Medsis with 11 million users.  It also stated that Medsis' minimum valuation was $110 million "based on the Peru deal alone" because, as stated in the Pitchbook, each of the purported deal's 11 million users generated $10 of value to Medsis.

94.      This representation about Medsis' value was false and misleading because Medsis had not executed an agreement with the authorities in Lima, Peru.  As Cabrera and Hess knew, Medsis did not have any users in Peru at the time.

95.      Thus, Defendants' representations to investors about the value of Medsis were false.  Hess, Cabrera, and Medsis knew or were reckless and/or negligent in not knowing that the authorities in Lima, Peru had not executed a contract or agreement with Medsis.

**E.  Hess Misled Investors about the Size of a Deal with a Brazilian Insurance Entity.**

96.      In 2017, Hess falsely represented to prospective investors that an agreement with a Brazilian insurance entity involved 16 million users when, in fact, it involved about 2 million.

97.      By 2017, Medsis told prospective investors that it had changed its business plan. Under Medsis' reported new "donation model" business plan, Medsis would donate its services and products, including payment cards.

98.      In the January 2017 Pitchbook, Medsis told prospective investors that under its "donation model" business plan, Medsis would generate revenue by receiving a small percentage

of the money transacted by end-users on the payment cards.

99.     In early 2017, Hess and Cabrera repeatedly represented to prospective investors that more users using Medsis' payment cards meant more revenue for Medsis.

100.    Before Medsis could generate revenue from its new "donation model" business plan, it needed sufficient capital to build out an entire database and financial network, partnerships with financial institutions, and technical knowledge.

101.    In February 2017, Medsis executed an agreement with a Brazilian insurance entity following its "donation" business model.  The contract stated that Medsis was to provide its services for 2 million customers.

102.    In a March 10, 2017 investor solicitation, Hess touted the agreement with the Brazilian insurance entity.  He sent prospective investors valuation summaries that he and Cabrera created.  Those valuation summaries represented that, from the 2 million users from the Brazilian insurance entity deal, Medsis would generate more than $84 million dollars in revenue over ten years.

103.    Two days later, on March 12, 2017, Hess sent another email to prospective investors soliciting investment in Medsis stating that the deal was to grow to 16 million users "over the next 18 months or so."  He also told prospective investors that Medsis would earn $5 million per month in revenue when users totaled 16 million users.  Hess represented that would happen in "18-24 months."

104.    Similarly, on March 29, 2017, Hess emailed investors a press release about the deal between Medsis and the Brazilian insurance entity.  Hess represented that the deal involved "some 16 million" families.

105.    Each of Hess' representations about the growth in users above 2 million was false

and misleading.  The Brazilian insurance entity had committed only 2 million of its users, for a pilot program testing Medsis' capabilities.  It had not committed 16 million of its users.  Hess knew these facts from the contract itself, yet he repeatedly misrepresented the scope of the contract.

106.     A reasonable investor would find the difference between 2 and 16 million users to be material, as it would change both the expected revenue from the business agreements Medsis claimed it had, and the value of Medsis as an entity.

107.     Ultimately, Medsis failed the test and never fulfilled its obligations under the donation contract with the Brazilian insurance entity.  Medsis did not generate any revenue from the deal.

**F.  Defendants Lied to Prospective Investors About Medsis Earning Revenue in 2017.**

108.     In January 2017, Medsis had very limited assets.  According to its financial statements (which were not shared with investors), Medsis generated no revenue in 2016 and, as of December 31, 2016, its total assets equaled $33,930.67 while its liabilities totaled $693,099.55.

109.     Medsis hid its financial state from investors, and lied to them about when Medsis would begin earning revenue.  During 2017, Cabrera and Hess made multiple false statements to prospective investors that Medsis had generated revenue or would imminently.  These misrepresentations included statements about revenue from a deal in Colombia and statements in a year-end investor letter.

**i.  Cabrera's Statement about Future Revenue from a Colombian Deal Was False When He Made It.**

110.     In or about December 2016, Medsis signed an agreement to provide services to a Colombian governmental entity entrusted with conveying reparations to victims of Colombia's

civil war.

111.    In February 2017, Cabrera told investors that Medsis would earn revenue from the deal with Colombia in one or two weeks.

112.    This was materially misleading in that it omitted the critical fact that there were substantial impediments to achieving revenue within 2 weeks.

113.    Cabrera knew, or recklessly disregarded, that his statement was false when he made it because it was not feasible at the time for Medsis to earn revenue from the deal that quickly.

114.    Medsis had told investors that the contract with the Colombian government was to convey cash reparations to victims of Colombia's civil war through the issuance of pre-paid debit or bank cards.  Medsis had represented that it would make a modest amount of money when card recipients paid for products or services using the card.

115.    On or about February 11, 2017, Hess recorded a call with Cabrera to send to prospective investors.  During the call, Cabrera discussed the Medsis deal with the Colombian government.  He told investors that Medsis would generate its first revenue from the contract the following week or, at the latest, in two weeks.

116.    Cabrera's statement was not true, and Cabrera knew or was reckless in not knowing it was false  Cabrera knew that Medsis could not generate revenue from receiving a percentage of transaction revenue on payment cards because it did not have the capacity to do so.

117.    In February 2017, Medsis lacked the capability and financial resources to internally create the system and financial network needed to manufacture the pre-paid debit or bank cards, issue them to users, and distribute them within the 1-2 week window in which Cabrera represented Medsis would begin collecting revenue from the cards.  In addition, Medsis

lacked the relationships with banks or other financial companies to outsource the process. For instance, in February 2017, Medsis did not have a necessary agreement with a Colombian bank to issue the pre-paid debit or bank cards. As CEO, Cabrera knew at the time of his statement that Medsis lacked this agreement.

118.    So, contrary to Cabrera's misrepresentations, Medsis could not have begun to earn revenue from the Colombian deal in February or March 2017. In fact, it never did.

**ii.    Cabrera Lied to Investors in an Investor Letter About Medsis Generating Revenue.**

119.    Cabrera's 2017 year-end update letter for investors falsely stated that Medsis had earned revenue when, in fact, it had not.

120.    According to Medsis' financial statements (not shared with investors), it did not earn any income in 2017.

121.    In addition, as of December 31, 2017, Medsis' liabilities exceeded its assets by more than $3.8 million.

122.    Cabrera drafted an update for investors, dated December 25, 2017 ("December 2017 Letter"). Hess emailed Cabrera's December 2017 Letter to prospective investors on December 26, 2017.

123.    The December 2017 Letter included numerous misstatements about revenue generation, including that:

a.    Medsis' revenues had increased by 50%.

b.    Medsis transitioned in 2017 into what Cabrera referred to as Phase II in Medsis' development, which he defined as "the post revenue phase of Medsis."

c.    Actual revenues processed in December 2017 surpassed prior estimates on the project.

These statements were false because Medsis had not ever generated any revenue.

124.    The December 2017 Letter stated that, under the contracts Medsis had currently entered into, Medsis projected it would generate $400 million in revenue in one year.  Cabrera fraudulently omitted from this statement that Medsis could not generate this revenue because it did not have the financial wherewithal, expertise, or resources to perform on the contracts it said it had signed.

125.    In an audio message recorded on January 19, 2018 and sent to prospective investors, Hess stated that the substance of Cabrera's December 2017 Letter remained accurate.

126.    From his involvement with Medsis, Hess knew or was reckless and/or negligent in not knowing that the information in Cabrera's December 2017 letter was false or materially misleading.

### G.   Defendants Misrepresented to Prospective Investors the Value and Contingent Nature of an Agreement with an Argentinian Trade Union.

127.    In 2018, Cabrera and Hess lied to prospective investors about the size and value of an agreement to provide registration and financial services to a supposed Argentinian labor union.  The original agreement was signed on or about February 15, 2018.  Cabrera and Hess represented that it involved 6.8 million users when, in fact, it did not.  They omitted to tell investors that the agreement was contingent upon the endorsement of the Argentinian government.  This was a material omission rendering their statements misleading.

### i.   The Union Did Not Have 6.8 Million Members.

128.    Cabrera and Hess told investors that the Argentinian union that entered into the contract with Medsis had 6.8 million members who were required to use Medsis' system under the agreement.  Cabrera and Hess represented to prospective investors that the contract with the Argentinian union obligated Medsis to register the union's members and facilitate the payment

24

of the members' monthly dues to the union through payment cards and a transfer payment system.

129.     In a July 27, 2018 call, Cabrera told prospective investors that Medsis would earn revenue equal to one-third of the union dues paid through the financial system and payment cards by 6.8 million supposed members of the Argentinian union Medsis had contracted with.

130.     Cabrera and Hess told prospective investors that Medsis' revenue calculations were based upon the number of users who would be employing Medsis' payment cards.

131.     During a call with Hess for investors recorded on or about April 16, 2018, Cabrera said that Medsis would register 2.2 million union members located in Buenos Aires within 18 months.

132.     The Argentinian trade union, however, did not have 6.8 million members as Cabrera and Hess reported, and thus, Medsis' revenue calculations were untethered to reality.

133.     Nor did the union have 2.2 million members located in Buenos Aires.

134.     Cabrera knew that the union had just been formed and did not have 6.8 million members or 2.2 million members in Buenos Aires.  Cabrera believed 6.8 million represented the total number of members in all unions in Argentina.

135.     Cabrera inflated the number of union members to inflate Medsis' revenue calculations.

ii.     **The Contract with The Argentinian Union Was Contingent upon Action by the Argentinian Government.**

136.     Cabrera omitted from his pitch to investors that the contract with the Argentinian union was contingent upon action by the Argentinian government.

137.     The Argentinian union was not authorized to perform the actions contemplated by the agreement with Medsis.  The union had just formed and was not officially fully recognized

yet under Argentinian law.  An addendum to Medsis' agreement with the union, dated June, 28

2018, expressly made the contract contingent upon the Argentinian government's approval of the

union to collect dues.

138.    Cabrera hid these material facts from prospective investors.  Cabrera kept

promoting to investors the contract and its resulting revenue, while remaining silent on its

contingency.

139.    During a call with Hess for investors recorded on or about April 16, 2018,

Cabrera said that Medsis would begin processing union members under the agreement with the

union in a couple of months.  He omitted any mention of the union's legal status or whether it

could collect union dues.

140.    On June 14, 2018, Hess recorded a call with Cabrera for investors.  During the

call, Hess and Cabrera spoke about the purported $1.1 billion in annual revenue Medsis had

under agreement from the deal with the Argentinian labor union and another agreement with a

Brazilian entity, described by Defendants as the "CLASP" deal (discussed below).  Cabrera told

investors about the expected revenue from those projects using the following language:

> That is on signed and again…I want to continue to say this because it is very
> important in the grand scheme of things, [the revenue is] on signed executed
> contracts that are moving forward.  That is not speculation and going "we think
> we can get this," "we're hoping to sign it."  No, no, no.  That is what we have,
> those are projects that already moving forward with us, and already signed and
> everything in place.  And I know I keep kind of beating that horse but it is a really
> important point in that this is not a speculation on what we think we can get.  This
> is this is what we have.

141.    Cabrera's statement was misleading because the revenue Cabrera claimed from

the Argentinian contract was contingent and speculative.  Medsis' supposed revenue was merely

what Medsis hoped to receive and not what Medsis then had.  The union was not authorized to

collect union dues, and until it was, Medsis would not be generating revenue under the

agreement.

142.    In his Second Quarter Medsis update circulated to investors after the end of June 2018, Cabrera said that the "Union Dues" contract in Argentina was Medsis' "biggest signed contract to date that we've been able to secure."

143.    Cabrera wrote "revenues of this contract will be well over $20m USD in the first year of implementation…[t]his contract alone is forecast to scale to more than $17B USD in Gross Revenue over the next 10 years."

144.    In the Second Quarter Medsis update, Cabrera did not mention the contingency clause in the contract or that the union was not officially authorized to operate as a union.

145.    To date, Medsis has not generated any revenue under the agreement with the Argentinian trade union.

## H. Defendants Misled Prospective Investors When They Said that Medsis had "Booked" $1.1 Billion in Revenue.

146.    In 2018, Hess and Cabrera falsely represented that Medsis had "booked" $1.1 billion in revenue, when, in fact, it had not nor was there any reasonable basis for Medsis to book or record in its accounting records or financial records that much in revenue at that time.

147.    On March 7, 2018, Hess forwarded to investors a "March Update" drafted by Cabrera.  Cabrera wrote that at the end of February 2018 Medsis had achieved its goal of $1 billion in "annual contracted revenue."  Cabrera claimed that the revenue stemmed from "signed" agreements, and not "projections" or "contracts in negotiation."

148.    In his cover email forwarding the March Update, Hess told investors that Medsis would receive 1% of the $100 billion spent on payment cards by users under contracts with the Argentinian union and the Brazilian CLASP deal (further discussed below).  Hess also misrepresented that the projects were "all ready to kick off!" and that "[o]ver the next months, all

payroll, benefits, and services will run through [Medsis'] system" for the trade union in Argentina.

149.    On or about March 13, 2018, Hess recorded a call with Cabrera promoting Medsis for investors.  In their pitch to investors, Hess and Cabrera said that Medsis had "booked" $1 billion in annual revenue:

> <u>Hess</u>: we also sent out the report…the more recent one [March Update] that talked about the fact that we actually contracted and booked one billion of annual revenue.  That is unheard of for a start-up company
> <u>Cabrera</u>: 1.1
> <u>Hess</u>:  1.1 billion.  Well excuse me. 1.1 billion of revenue.

150.    On a subsequent recorded call on or about April 16, 2018, Cabrera said to prospective investors that Medsis had "everything in place" to perform the contracts in Argentina and Brazil.

151.    Hess' and Cabrera's statements were false.  Medsis had not booked $1.1 billion in revenue in its accounting records or financial statements, which Cabrera could access as CEO.

152.    Hess and Cabrera's statements about Medsis having "booked" $1 billion revenue were misleading for other reasons as well.  First, Medsis had no ability to earn revenues and perform on the proposed projects in Argentina and Brazil.  The projects required tens of millions of dollars to operate, and Medsis did not have the financial resources to establish and operate the payment systems for millions of potential users contemplated by the agreements.  It was false for Hess to state that the projects were "all ready to kick off!" and Cabrera to say that "we have everything in place."

153.    Second, even if Medsis had the financial wherewithal or capability of performing under the agreement with the Argentinian trade union, as discussed above the contract was contingent and Cabrera and Hess grossly inflated its value.

**I.  Defendants Misled Investors about Payment Cards and Revenue for a Brazilian Contract.**

154.   In 2017, Medsis entered into an agreement with a Brazilian entity that operated a membership and loyalty program there.  Cabrera and Hess described the project as the "CLASP" deal. Through a series of agreements, Medsis agreed to donate database services, IDs, and payment or pre-paid credit cards as part of the CLASP deal, meaning that it was not being paid directly by the client for its services.

155.   During 2018 and 2019, Cabrera and Hess made numerous false and misleading statements to prospective investors about how many payment or pre-paid credit cards Medsis had made, had ordered, and were in the hands of users generating revenue for the CLASP deal.

**i.  Medsis Did Not Have Cards in Users' Hands Generating Revenue.**

156.   Cabrera and Hess told investors in mid-2018 that Medsis' business prospects depended on its ability to get payment cards into users' hands for them to spend money.

157.   Cabrera and Hess told investors that Medsis would make 1% from all transactions by users in connection with the one contract it had signed with a customer in Brazil, the CLASP deal.

158.   Cabrera and Hess told investors that Medsis would receive approximately $10 per card per month in gross revenue through the CLASP deal.

159.   On July 27, 2018, Hess and Cabrera recorded a call pitching Medsis securities and Hess sent it to investors.  On the call, Hess stated that Medsis had enough cash flow and financing at that time to proceed with the CLASP deal.

160.   On the July 27, 2018 call, Cabrera also said that Medsis had already printed 15,000 payment cards for the CLASP deal and expected to issue 100,000 payment cards per month going forward.

161.   The next day, July 28, 2018, Hess and Cabrera hosted a conference call to pitch the offer of securities to investors and answer investors' questions.  The call was also recorded to circulate to investors who could not make the call.

162.   On the July 28, 2018 call, Cabrera said that 15,000 payment cards made had already been sent out to users.  He said that he expected to see revenue from the cards within 30 days.

163.   An investor asked Cabrera on the July 28, 2018 call whether "the cards you have in Brazil are working and collecting revenue as we speak."  Cabrera answered, "correct."

164.   Cabrera said during the July 28, 2018 call that "everything is in place" and "we expect to be profitable in Quarter 4."  When asked, Cabrera stated that Medsis did not need to raise more money to perform the CLASP contract.

165.   At the end of July 2018, Cabrera authored a second quarter of 2018 Medsis update for distribution to investors.  Cabrera wrote that Medsis was "officially a revenue-generating company" due to the CLASP cards in circulation.  He also wrote that Medsis "officially issued our first ever functioning and revenue generating cards for CLASP."

166.   Cabrera's statements were not true because Medsis did not then have any cards then generating revenue for it, let alone 15,000 cards.  Medsis did not generate any revenue in 2018.

167.   Hess and Cabrera's statements were also misleading because Medsis did not have the money and resources it needed to buy and distribute the cards and establish the system to have them function.

### ii.   Medsis was not in Position to Order and Disseminate 100,000s of Payment Cards within Months.

168.   Cabrera and Hess misled investors about when Medsis would have 100,000s of

payment cards under the CLASP contract generating revenue.

169.   During the July 28, 2018 call, a prospective investor asked "how many CLASP cards can we have issued in the field by the end of September in people's hands?"  Cabrera answered more than 150,000 cards, and he said that Medsis should have 1 million cards issued to users by the end of the year.

170.   On August 5, 2018, Hess reported to an investor that Medsis had ordered 200,000 cards for the CLASP contract as a result of investors' quick investments in Medsis.

171.   Cabrera's and Hess' statements were false.  In July or early August 2018, Medsis was not in a position to order 150,000 cards and have them in use generating revenue by the end of September

172.   The number of cards generating revenue and the time when additional cards would be generating revenue were material to investors because Medsis was obligated to make substantial payments to investors at the end of 2018.

173.   Beginning in July 2018, Cabrera and Hess offered prospective investors Medsis securities that promised an additional annual dividend or royalty payment equal to the investor's principal.  For example, if an investor bought Medsis securities in July 2018 for $500,000, then Medsis promised to pay the investor $500,000 every January for the next ten years.

174.   On his call with investors on July 28, 2018 and in subsequent communications, Cabrera told investors that the money raised from selling the securities that promised royalty annual payments would be used to purchase and activate payment cards under the CLASP contract, from which Medsis would earn $10 per card per month.

175.   On an August 7, 2018 call, Hess told prospective investors that the revenue generated from the payment cards by the end of the year would be sufficient to fund the

promised royalty payments back to investors.

176.   Investors invested millions of dollars in Medsis, buying securities with the promised 100% annual royalty payment.  To date, Medsis has not generated any revenue from the CLASP contract.

177.   Medsis has defaulted on its annual dividend or royalty payment obligations.

**J.  Cabrera Misappropriated Medsis Funds for his Personal Use.**

178.   Cabrera misrepresented to investors the use of investment proceeds.  He hid from investors that he was diverting investment proceeds from Medsis to himself.

179.   During recorded interviews and in investor presentations, Cabrera represented that money raised from investors was going to be applied to Medsis' operational expenses associated with entering into and performing contracts with Central and South American entities.  When he made these representations, Cabrera well knew, or recklessly disregarded that – in addition to his regular salary from Medsis, Cabrera was repeatedly using investor money to pay for his own personal expenses and transfer money to third-party entities that he owned.  Cabrera's representations to investors about the use of their funds were materially misleading in that they concealed the fact that a material portion of the investors' money was being used for Cabrera's personal expenses.

180.   From at least 2017 through March 2019, Cabrera misappropriated corporate funds in various ways, including:  (1) using corporate debit cards for personal purchases like groceries, meals, and incidentals totaling thousands of dollars; (2) using corporate funds to pay for thousands of dollars in personal expenses charged to his personal charge or credit card; and (3) withdrawing and transferring thousands of dollars of cash from Medsis' accounts to pay his rent and other personal expenses.  In addition, Medsis' bank records also show that Cabrera

transferred thousands of dollars to another company Cabrera owned.

181.    Cabrera's use of corporate funds for his own personal use was in addition to his salary and followed his promises to investors to use their funds for Medsis' operations.  Cabrera used these corporate funds, which had come from investors (as Medsis never generated revenue), and hid from investors his personal use of their funds.

### K. Hess Lied to Investors About Receiving Commissions or Compensation for Raising Investor Funds.

182.    Hess falsely told investors that he was not receiving any compensation or commissions for raising money for Medsis.

183.    Hess had spent most of his career as an investment adviser representative and associated with a registered broker-dealer.  He was familiar with the rules governing the offering and sales of securities.  Hess understood that he could not legally offer and sell securities for a commission without being associated with a registered broker-dealer.  At no time when he sold securities relating to Medsis was Hess associated with a registered broker-dealer.  Nevertheless, Hess arranged for Cabrera and Medsis to pay him to sell securities.

184.    To disguise his unlicensed selling, Hess claimed he was not getting paid for selling securities.  For example:

    a.   In a July 2015 email to prospective investors, he wrote that he was "not being compensated for referring investors."

    b.   In a memorandum he sent to prospective investors in February 2016, Hess represented that he "does not receive any fee, commission or other consideration for creating and managing Mobiletech, nor does he receive consideration for raising funds."

    c.   In the Mobiletech Form D Hess filed with the Commission in June 2016, Hess

reported that he received $0 from the proceeds of the sale of securities.

    d.   In January 2019, Hess told an investor that he did not get commissions on money raised.

185.   These statements that Hess did not receive any compensation or commissions for selling securities were false. Medsis and Cabrera compensated Hess for his efforts raising money from investors in the following ways:

    a.   The Medsis securities offering began with Hess receiving sales-based compensation. In connection with his initial sale of 3% of Medsis stock in 2015, Hess received approximately 1 share for every 3 shares he sold.

    b.   During the course of his fundraising from investors in 2016, Hess transferred tens of thousands of dollars received from investors to his own bank account and to other bank accounts he controlled. In 2016, Hess received at least $50,000 from money raised from investors.

    c.   In May 2017, Cabrera and Hess entered into a written agreement under which Medsis would pay Hess $15,000 to, among other things, "[a]ttract and refer investors for purchase of Medsis stock equity," "[p]rovide office/administrative support and investor communications," and "[p]repare and/or assist in preparation of capitalization table." Under the agreement, Medsis wired Hess $85,000 in 2017, $90,000 in 2018, and more than $15,000 in 2019. In addition, Cabrera transferred to Hess Medsis stock in June 2017 as payment under the agreement.

## L.  Cabrera Lied about Medsis' Prospects to Hide His Prior Lies.

186.   By 2020, investors began to question Hess and Cabrera about where the proceeds of their investment went and why Medsis had not generated the hundreds of millions of dollars in

revenue that Cabrera and Hess had promised.

187.    In 2020, Cabrera did not inform the investors that Medsis never was in a position to perform under its agreements, that it failed to generate any revenue, that it was deeply in debt, that it had outstanding judgments against it from creditors, or that Medsis lacked employees or even an office.  Instead, in the fall of 2020, Cabrera told investors multiple times that he had financing coming imminently that would yield Medsis tens of millions of dollars that would be enough to repay investors their principal and execute on the contracts that he said were still valid in South America.  But there was no imminent financing.  Cabrera was perpetuating his lies to conceal his prior fraud.

## II.    The Medsis Offering

### A.  Cabrera and Hess Worked Together to Offer and Sell Medsis Securities.

188.    By March 31, 2015, Hess began soliciting investors to invest in Medsis.

189.    At Cabrera's direction, Hess initially offered multiple investors, in total, 3% of Medsis' shares for $500,000.

190.    Investors responded to Hess' solicitations.  On or about April 6, 2015, Hess sold his first securities on behalf of Medsis.

191.    For the next five years, Hess and Cabrera continued to publicly offer and sell Medsis securities.

192.    Initially, from 2015 to 2017, Hess and Cabrera used two different shell intermediary companies to transfer shares to investors.

193.    From April 2015 to July 2015, they used a Maryland shell company.

194.    In July 2015, Hess formed Mobiletech as a shell company specifically for the purpose of "raising money" for Medsis by selling its securities.

195.     Hess and Cabrera offered and sold shares of Medsis stock through Mobiletech until approximately June 2017, when Hess and Cabrera began to sell securities directly to investors, instead of through an intermediary.

196.     In collaboration with Cabrera, from 2015 through 2020, Hess raised approximately $9.6 from investors through selling securities.

197.     The Medsis securities were often shares of Medsis stock.  Hess and Cabrera also sold securities in the form of a promissory note convertible into Medsis stock and in the form of Medsis shares with a promised annual dividend payment equal to 100% of an investor's invested principal.

198.     Medsis did not register with the Commission any offer and sale of its securities. Contemporaneous with any offer and sale, neither Hess, Cabrera, nor Medsis provided investors with a Medsis prospectus, audited financial information, or any Medsis operating agreements or disclosure that the Medsis securities sold were unregistered and could not be resold unless registered or if they qualified for an exemption from registration.

199.     Defendants did not place restrictions on the resale of the Medsis securities sold and did not make any reasonable inquiry to determine if investors were acquiring the securities for themselves or for other persons.

200.     Defendants offered and sold Medsis securities to unaccredited investors.

**B. Cabrera and Medsis Also Sold Securities Without Hess' Direct Involvement.**

201.     As part of Medsis' unregistered public offering, from 2017 to 2019, Medsis and Cabrera publicly offered and sold some Medsis securities without using Hess to promote or broker the sales.

202.     In 2017 and 2018, Cabrera and an Australian broker offered Medsis securities in

an attempt to raise $20 million from investors.

203.    Cabrera traveled to Australia to work with the Australian broker there and promote and sell Medsis securities.

204.    Proceeds from the Australian sales were wired to Medsis' bank account in the United States.

205.    Together Cabrera and the Australian broker raised approximately $1.7 million from selling shares of Medsis.

206.    During the fall of 2017, Cabrera raised approximately $490,000 from the sale of securities in the form of notes convertible into Medsis shares to investors from Singapore.

207.    From October 2017 through March 2019, Cabrera raised without Hess' direct involvement approximately $1.1 million from U.S. investors.

208.    From October 2017 through January 2018, Medsis sold securities in the form of notes convertible into Medsis shares.  From July 2108 through March 2019, Medsis sold investors Medsis shares with a promised annual royalty payment equal to 100% of the principal investment.

209.    In total, Cabrera raised approximately $3.3 million without Hess' direct involvement.

## FIRST CLAIM

**Fraud in the Purchase or Sale of Securities in
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder, or,
in the Alternative, Aiding and Abetting
Medsis' Violation of Section 10(b) and Rule 10b-5 Thereunder
(All Defendants)**

210.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 209 above, as if set forth fully herein.

211.    As detailed above, Defendants engaged in a fraudulent scheme through a series of fraudulent acts, statements, and material omissions through which investors were tricked into believing that they were funding a fast-growing startup company and induced to buy securities offered over the course of many years.

212.    By engaging in the conduct above, these Defendants, directly or indirectly, acting intentionally, knowingly, or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons, or, in the alternative, Cabrera and Hess aided and abetted these violations.

213.    The conduct of these Defendants involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in losses to other persons.

214.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or, in the alternative, Hess and Cabrera aided and abetted these violations in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]

## SECOND CLAIM

**Fraud in the Offer or Sale of Securities in
Violation of Section 17(a) of the Securities Act, or, in the Alternative,
Aiding and Abetting Medsis' Violation of Section 17(a)**

**(All Defendants)**

215.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 214 above, as if set forth fully herein.

216.    Defendants, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or of the mails: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon purchasers of the securities or, in the alternative, Cabrera and Hess aided and abetted these violations.

217.    The conduct of these Defendants involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in losses to other persons.

218.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], or, in the alternative, Hess and Cabrera aided and abetted these violations in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## THIRD CLAIM

**Unregistered Offer and Sale of Securities**
**In Violation of Sections 5(a) and 5(c) of the Securities Act, or, in the Alternative,**
**Aiding and Abetting Medsis' Violation of Sections 5(a) and 5(c)**

**(All Defendants)**

219.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 218 above, as if set forth fully herein.

220.    The stock, convertible promissory notes, and membership units in limited liability companies offered by Defendants are "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

221.    No registration statements have been filed with the Commission or have been in effect with respect to any offering alleged herein.

222.    Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  They sold securities to more than 150 investors and collectively obtained proceeds of at least $12.9 million.

223.     By engaging in the conduct set forth above, Defendants violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)], or, in the alternative, Hess and Cabrera aided and abetted these violations in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## FOURTH CLAIM

### Acting as an Unregistered Broker-Dealer in
### Violation of Section 15(a) of the Exchange Act

### (Paul Hess)

224.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 223 above as if set forth fully herein.

225.    By engaging in the conduct above, Hess, directly or indirectly, singly or in concert with others, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer or associated with a registered broker or dealer in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

226.    As part of, and in furtherance of the violative conduct, Hess regularly promoted securities to investors and advised investors about the merits of investing in those securities. Hess also directly or indirectly received compensation based on their successful promotion efforts that resulted in purchases or sales of securities.

227.    As a result, Hess acting directly or indirectly, and singly or in concert with others, violated, and unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter permanent injunctions, including an injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Exchange Act Section 10(b) [15 U.S.C. § 78(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Securities Act Sections 5(a), 5(c), 17(a) [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; and, for Hess, Exchange Act Section 15(a) [15 U.S.C. § 78o(a)]; and an injunction prohibiting Hess and Cabrera from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own respective personal accounts;

B.      Require Defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.      Require Defendants to pay an appropriate civil monetary penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and,

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Peter Bryan Moores
Marc J. Jones (Mass. Bar No. 645910)
  Senior Trial Counsel
Peter Bryan Moores (Mass. Bar No. 658033)
  Senior Enforcement Counsel
Kevin B. Currid (Mass. Bar No. 644413)
  Assistant Regional Director
Martin F. Healey (Mass. Bar No. 227550)
  Regional Trial Counsel

33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-4576 (Moores direct)
mooresp@sec.gov (Moores email)

DATED: August 19, 2021